# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### CASE NO. 3:19-CR-211-FDW-DCK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| LAWRENCE JEFFREY BROOKS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendant Lawrence Brooks' Motion To Suppress Evidence" (Document No. 58) filed July 14, 2020 and the Government's responsive pleadings (Document Nos. 44, 65, 72). Having carefully considered the motion, the record, and applicable authority, as well as the testimony and arguments presented at hearings conducted on July 29, 2020 and August 3, 2020, the undersigned will recommend that the motion be <u>granted</u> in part and <u>denied</u> in part.

## I.    PROCEDURAL BACKGROUND

On September 17, 2019, Lawrence Jeffrey Brooks ("Defendant" or "Brooks") was charged in a Superseding Bill of Indictment with drug trafficking conspiracy, possession with intent to distribute methamphetamine (three counts), possession of a firearm in furtherance of drug trafficking (two counts), and possession of a firearm by a convicted felon (two counts). (Document No. 22). On February 12, 2020, Defendant filed his original "Motion To Suppress…" (Document No. 43). On February 16, 2020, the Government filed its "United States Of America's Response In Opposition To Defendant's Motion To Suppress..." (Document No. 44). At a Status Conference

conducted on July 10, 2020, Defendant's motion was denied without prejudice by Text Only Order.

"Defendant Lawrence Brooks' Motion To Suppress Evidence" (Document No. 58) and his "Supplemental Memorandum Of Points And Authorities In Support Of Defendant Lawrence Brooks' Initial Pretrial Motions" (Document No. 63) were filed on July 14, 2020. The "United States Of America's Response In Opposition To Defendant's Motion To Suppress Evidence" was filed on July 15, 2020. (Document No. 65). On July 21, 2020, a "Reply To United States' Response In Opposition To Defendant Lawrence Brooks' Motions To Suppress" (Document No. 67) was filed. Finally, on July 26, 2020, the "United States of America's Response To Defendant's Reply to United States' Opposition To Motion To Suppress Evidence" (Document No. 72) was filed.

The question before the Court is whether law enforcement officers violated Defendant's constitutional rights in their interaction with him during a traffic stop and search on May 14, 2019, and if so, whether any or all the Government's evidence arising from that incident should be suppressed. This matter is now ripe for a Memorandum and Recommendation to the Honorable Frank D. Whitney.

## II.    FACTUAL SUMMARY

Evidence in this suppression matter was presented on two different days – July 27, 2020 and August 3, 2020. On July 27, 2020, the Government presented as its only witness the testimony of Detective Clint Bridges ("Bridges") of the Gastonia Police Department. On August 3, 2020, Defendant presented the adverse testimony of Officer Chris Newman ("Newman") of the Charlotte-Mecklenburg Police Department and re-called Detective Bridges, as an adverse witness. Important exhibits were admitted into evidence, including body-worn camera footage from

officers on the scene. For purposes of clarity, the body-worn camera footage is addressed first, followed by a summary of the testimony.

## A. BODY-WORN CAMERA FOOTAGE

While the Court cannot possibly describe the entire content of the body-worn camera footage here, the undersigned believes the following to be a fair and accurate summary:

Upon Officer Newman's approach to Defendant's vehicle on May 14, 2019, he immediately engaged Defendant in a conversation about the alleged act of following another vehicle too closely. Defendant was told by Newman that he was about six inches from the back of another vehicle while turning. Newman asked if Defendant had been drinking that day. Newman identified himself as a DWI enforcement officer and asked if Defendant could pass a field sobriety test; Defendant responded yes. Newman asked Defendant to step out of the vehicle purportedly to do the test, though one was never conducted.

As Defendant stepped out of the vehicle, Newman asked, "have you been smoking weed in the car? I can see some shake." Defendant denied smoking weed in the vehicle. Defendant told Newman that the vehicle was rented by his uncle, Quilford Dillard, who had given him permission to use it. At that point, Newman approached the driver's side window and appeared to look into the passenger area of the vehicle without opening the door. Newman then approached the front passenger side window of the vehicle and appeared to look into the passenger area without opening the door.

Newman asked Defendant if he had smoked any marijuana, had any substance abuse problems, and if he took any medication or "anything like that." Defendant responded in the negative to all these questions. Newman told Defendant to sit on the tailgate of the truck, and he returned to his patrol vehicle. Newman appeared to contact dispatch and requested a marked patrol

unit to come to the location of the traffic stop. Newman then appeared to put Defendant's driver license information into his patrol vehicle computer. Newman then re-approached Defendant and asked about his current home address. Defendant stated his address was 1900 W. Charlotte Avenue, Gastonia NC, Apartment 21. He also stated that he was technically homeless, and that he lived between that address and his brother-in-law's residence at Aurora Station Apartments in Charlotte.

Newman then addressed with Defendant the allegation of following another vehicle too closely. Defendant explained that he was looking in the rear-view mirror and that he even saw the officer's vehicle behind him. Newman asked Defendant, "so you were looking in the rear-view and didn't see the car in front of you?" Defendant stated he did not see the car. Newman then asked, "so basically, when you followed that car too closely you weren't looking ahead; you were looking in the rear-view?" Defendant responded, "I was looking both ways." Newman countered with, "and you made a mistake?" Defendant said, "I made a simple mistake." Newman then stated, "if you're an honest man, I will work with you and I won't write you a ticket."

Newman asked Defendant if his uncle drives this truck "all the time." He stated yes, but that it was a rental vehicle and that he had got it that morning. At this point, the requested marked patrol unit containing a uniformed officer arrived on scene. Newman approached the uniformed officer before he walked up, stated that Defendant may be armed, and asked that he stay until he ran through the process. Newman then returned to his patrol car and appeared to look up Quilford Dillard on his patrol vehicle computer. It appeared that Newman could not locate Dillard's information because he then asked Defendant about Dillard's birthdate and the spelling of his name.

Newman re-approached Defendant again and stated, "I'm going to be straight up honest with you. When I was up there talking to you and everything, I got the odor of marijuana, okay? You are in apparent control; would you give me consent to search real quick?" Defendant responded, "No, I do not because that's not my car." Newman explained to Defendant that he was in apparent control and asked if he understood the laws of North Carolina on that issue. Newman then stated, "I smell it. I'll tell you right now, I'm going to conduct a probable cause search and it's nothing against you but I'm just trying to work with you." Defendant responded that neither he nor the vehicle smelled like marijuana. Newman then re-stated that he smelled marijuana and that he was "seeing some things in there."

Newman began by searching the front driver side area of the vehicle. Newman pointed out what he called "seeds" in the seat and "shake" in the console, along with a bottle of deodorizer/sanitizer spray. Newman then proceeded to search the front passenger side area of the vehicle. While doing so, Newman whispered and motioned to the uniformed officer to get close to Defendant because he was "going to run." Newman pointed out what he believed to be marijuana shake in the passenger seat of the vehicle. Newman then moved to the back right passenger side area of the vehicle.

Newman discovered a black backpack—with a small locked black box inside—in the back seat. Newman also located and searched a grey and black backpack in the back passenger seat area. At this point, it appeared Defendant was no longer on the tailgate but was behind Newman watching as he searched. Newman stopped searching and closed the back right door of the vehicle, then asked Defendant to resume his seat on the tailgate. As Defendant turned to go back to the tailgate, Newman placed him in handcuffs and searched his person.

Defendant asked why he was being arrested and Newman informed him that he would explain. After handcuffing and searching Defendant, Newman asked if he had the keys to the locked black box. Defendant claimed he did not have the keys to the box. Newman subsequently retrieved the keys Defendant left in the console of the vehicle. Newman then proceeded to open the grey and black backpack beside Defendant on the tailgate. Upon opening the backpack Newman stated, "damn, looks like someone left some meth in your car." Defendant replied, "that ain't my fucking car," to which Newman responded, "well you're driving it, you're in apparent control, you're under arrest for the possession of methamphetamine."

Defendant stated to Newman that "this is bullshit man, damn car did not smell like no damn weed either, making that shit up for real." Newman responded, "am I making up that meth right here too?" Newman then proceeded to use the keys from the vehicle to unlock the locked black box that was inside the black backpack. After unlocking the box, Newman turned and opened the box in front of the Defendant. It contained guns. Defendant stated, "them is definitely his guns. So, I mean they clean. But they not on me. They not mine." Newman asked Defendant if he wanted to talk to someone like a detective. Defendant responded with "I don't want to talk to anyone. Take me to jail."

Newman had the uniformed officer place Defendant in his patrol vehicle. An unknown officer — wearing a Captain America shirt — then stated he was going to snap a picture to "send to her." Newman then stated, "wait a minute" and turned off his body worn camera. When the body worn camera came back on, it shows the three officers talking together without sound. The sound returned as Newman walked to the front passenger side of the vehicle. Newman appeared to collect some of the marijuana shake from the vehicle seat before receiving another phone call; the body worn camera then turned off.

When the camera began recording again, Newman returned to Defendant's vehicle and began collecting the alleged marijuana shake. The unknown officer said, "especially on the driver's side, it's stronger." Newman then talked to the other officer about what he did and noticed while searching the vehicle. Newman stated, "I felt the bag and it was locked and I felt the 'crumblies.' Through my training and experience that's meth." Newman then moved to the front driver side area and began collecting the alleged marijuana shake. Newman also found what appeared to be a piece of marijuana that gave off a strong odor. Newman called over the unknown officer and presented it to him to smell. The unknown officer then moved the vehicle out of the roadway.

**B. WITNESS TESTIMONY**

1. First Day: Testimony of Detective Bridges

The Government presented the testimony of Detective Clint Bridges. Detective Bridges testified that he had been a law enforcement officer for 18 years, beginning with the Shelby Police Department in 2002, and then continuing with the Gastonia Police Department beginning in 2009. He is currently a Gastonia police officer assigned to the Drug Enforcement Agency (DEA) Task Force. Detective Bridges testified that of his 18 years of law enforcement experience, all but about two have been spent investigating drug trafficking offenses. Detective Bridges' testimony largely addressed the drug investigation of Defendant from two different jurisdictions that *preceded* the events of May 14, 2019.

Detective Bridges identified Defendant in court based on his participation in a Task Force investigation code-named "Iceberg." Bridges testified that during the Iceberg investigation the Task Force developed a cooperating defendant (R.F.) from a traffic stop in Gastonia in March 2019. R.F. was utilized to make controlled purchases and to gather information on K.F. – who

would also become a cooperating defendant – and on other co-conspirators in the Western District of North Carolina. Bridges testified that based on the cooperation of R.F. and K.F., the Task Force was able to develop approximately 20 investigative targets in the area.

Bridges testified that he independently verified R.F.'s reliability as a confidential informant. Bridges stated that he was able to verify that Defendant was R.F.'s source of supply for methamphetamine by checking his mobile phone data, tolls, and through phone calls R.F. made to K.F. Bridges testified that R.F. was truthful about K.F. and Defendant being in a romantic relationship, his description of Defendant, where Defendant resided, and the vehicles Defendant used.

Bridges testified that R.F.'s first controlled purchase was from K.F. and Defendant on April 5, 2019. On April 5, 2019, law enforcement officers met with R.F. for intelligence gathering, and there K.F. disclosed information about R.F. and another person known as "Red." At that time, R.F. did not know Red's real name. Bridges testified that R.F. disclosed: K.F. and Red were in a romantic relationship and where they lived together; Red used a Ford Flex Rebel vehicle; and K.F. had disclosed to him that Red was her source of supply for methamphetamine. Bridges testified that R.F. did not know the name of Red and K.F.'s apartment but was able to point it out to law enforcement officers.

Bridges stated that while the Task Force was targeting K.F. with a controlled buy, they were able to narrow K.F.'s exact apartment building down to 8069 or 8617 Wood Lake Court, but they could not positively identify which room. The Task Force officers were also able to positively identify the vehicle K.F. was driving – which was the Ford Flex mentioned by R.F. Bridges indicated that based on the information they had at the time, surveillance was conducted on the Ford Flex. During the surveillance, Defendant came out of an apartment with a backpack, entered

8

the Ford Flex, and then departed. Surveillance was maintained on Defendant as he travelled to Mt. Holly, North Carolina, where the Task Force officers conducted a traffic stop on him. During the traffic stop, Defendant presented a driver's license showing he was Lawrence Jeffrey Brooks. Detective Bridges testified that it was on this occasion that the Task Force identified "Red" as Lawrence Jeffrey Brooks.

Bridges testified that on April 11, 2019, the Task Force was still conducting surveillance at the apartment building 8617 Wood Lake Court. Defendant was observed coming out of the building with a backpack and placing it into a teal green or bluish green Nissan Altima before returning inside. Bridges stated that as Defendant returned to the apartment building, surveillance followed him on foot and observed him going into apartment 302 in building 8617 — this was the occasion when the Task Force learned the apartment Defendant lived in. Bridges confirmed that this was the apartment the Task Force ultimately searched on May 14, 2019 (after the traffic stop at issue here).

Bridges testified that eventually Defendant returned to the Altima and departed the apartment with the surveillance team following him. The surveillance team lost track of Defendant a couple of times, but Defendant eventually returned to the apartment building and entered apartment 302. Bridges testified that eventually the surveillance team observed two other individuals involved in the case at the apartment building – Bobby Canaday ("Canaday") and Johnny Wells ("Wells"). The Task Force was able to determine that both Canaday and Wells resided in the same apartment with Defendant.

Bridges testified that Task Force Officers followed Wells and Canaday to a U-Haul storage facility that was "basically across the street" from the apartments on Sharon Road West. Officers observed Wells exit the vehicle with an empty bag and enter Building B of the storage facility. A

9

short while later, Wells returned to the vehicle—with what officers believed was a bag that now contained an item — then they returned to the apartment. Upon returning to the apartment building, Wells was observed exiting the vehicle and entering apartment 302 with the bag. Bridges testified that following this activity, he served an administrative subpoena on the U-Haul facility for information.

Bridges related that after obtaining the subpoenaed information from the U-Haul facility, he received a call from the U-Haul facility informing him that another federal agency was seeking the same information. Eventually, Bridges determined that the FBI was also investigating Defendant. Bridges testified that the FBI began targeting Defendant based on information they had received from a 2018 seizure of drugs out of Brunswick County, in eastern North Carolina. Defendant was the subject of a second investigation.

Bridges testified that in 2018, Brunswick County narcotics officers received information from a confidential source regarding individuals — Defendant, Robert Henry, Juan Moreno, and a Mr. Villa Lobos — who allegedly trafficked methamphetamine in the Gastonia area. Bridges stated that the confidential source provided good information and that he was in debt to the organization involved. Brunswick County officers paid off the confidential source's debt and used his information to target the organization. The confidential source and his information led to a seizure in Brunswick County of approximately 471 grams of methamphetamine and a stolen firearm. Bridges determined that the Brunswick County organization's source of methamphetamine was named "Red."

Bridges testified that the law enforcement officers in Brunswick County were able to use their confidential source to initially meet with Defendant and others in Myrtle Beach, South Carolina. The officers observed Defendant driving a Mazda rental vehicle with a Georgia tag at

the time. Bridges testified that this was the same vehicle that the 471 grams of methamphetamine was seized from a few days later. At the time of the seizure, officers out of Brunswick County were able to identify Defendant as "Red" based on their surveillance and information provided by their confidential source.

Bridges testified that the Brunswick County officers were able to order two kilograms of methamphetamine from the organization through Robert Henry. When Henry arrived, Brunswick County officers traffic-stopped both Henry's vehicle and another vehicle that was traveling in tandem with it. The second vehicle was the same one that Bridges had previously described being driven by Defendant – the Nissan Altima; the vehicle was being operated by Moreno and Villa Lobos. Bridges testified that after the traffic stop, Henry began cooperating with the law enforcement officers there.

Bridges stated that Henry was a methamphetamine courier for Defendant, and that Defendant had directed him (Henry) to deliver the methamphetamine to Wilmington. Henry also told the officers that Defendant was partners with the other people in the Nissan; and that the stolen firearm that was seized was purchased and given to them by Defendant. Bridges stated that Henry told the officers that Defendant does not carry methamphetamine on him; he stores all of his methamphetamine in storage units. Henry also disclosed to the officers that at that time, in 2018, Defendant had multiple ounces of methamphetamine in a storage unit on Mt. Holly Road in Charlotte.

Bridges testified that after identifying the storage unit with the administrative subpoena on April 11, 2019, the Task Force learned that the unit (at the U-Haul facility) was rented by Bobby Canaday. Bridges stated that the Task Force called Officer Chris Newman of the Charlotte-Mecklenburg Police Department, a drug detection canine handler, to the storage facility. Officer

Newman deployed a drug detection dog on the unit rented by Canaday, along with other units. Bridges testified that the officers observed the dog give a positive indication on Unit 240, which was Canaday's unit in Building B.

The Task Force began issuing subpoenas for videos from the storage facility for occasions when Mr. Canaday's card was used to access the unit, and they found numerous occasions when Defendant, Wells, and Canaday visited that particular unit, number 240. In some of the videos, Bridges could tell Defendant was carrying a black backpack into the facility and unit 240. Bridges stated that the bag involved was very similar, "if not the same bag," that methamphetamine was ultimately seized out of at the May 14, 2019, traffic stop. Bridges testified that the video, as well as the card swipe data, demonstrated that Canaday's card was used only to access the second floor of Building B where Unit 240 was located.

Bridges observed that the video from April 30, 2019 was significant; after the targets entered and left the unit at the U-Haul facility, they never returned. Officers obtained video of the targets moving a large black duffel bag out of Building B into the Nissan they were in, and they departed with it. Bridges testified that the Task Force officers believed it to be the same black duffel bag that was ultimately seized from the Morningstar facility on May 14, 2019, which contained eight kilograms of methamphetamine. Bridges testified that Canaday went to the Morningstar storage facility on the evening of April 30, shortly after the targets departed the U-Haul facility. Officers believe Canaday carried the same black duffel bag from the U-Haul facility into the Morningstar facility. In short, Defendant and his co-conspirators appeared to switch storage facilities.

Bridges testified that Task Force officers were able to obtain the same type of video and card swipe information from the Morningstar facility as they had from the U-Haul facility.

Detective Bridges testified one of the photos presented to him from the Morningstar facility was from May 14, 2019, the day Defendant was stopped and arrested. Bridges stated that the photo showed Defendant carrying a distinctive gray backpack in his hand. The bag appeared to be empty when Defendant entered the facility; it appeared to contain an item when he exited.

At the time of the photo on May 14, 2019, Bridges was on duty doing surveillance of Defendant and the Morningstar facility. At approximately 1:30 p.m., officers observed Defendant and the Chevrolet Colorado truck he was operating. Defendant was photographed carrying a black duffel bag slung over his shoulder. Defendant entered the Morningstar unit with the bag in his hand, and then re-appeared with the same bag which then appeared to contain an item.

Detective Bridges testified that based on his training and experience — along with the investigation information discussed above — he believed there were illegal drugs inside the bag. At approximately 3:00 p.m. that day, Officer Newman was called and asked to perform an independent "walled-off" traffic stop on Defendant. Detective Bridges was not personally present during that traffic stop, nor during the subsequent search by Officer Newman.

2. Second Day: Testimony of Officer Newman

Defendant called Officer Chris Newman as an adverse witness on the second day of the hearing. Officer Newman of the Charlotte-Mecklenburg Police Department testified that he had been a law enforcement officer for approximately 21 years and had been a DEA Task Force officer since 2010. Newman stated that in addition to working with the DEA Task Force, he has also taught drug interdiction classes to law enforcement officers across the state over the past thirteen years. Newman is also a canine handler with the Charlotte-Mecklenburg Police Department and has seized an estimated twenty to twenty-five thousand pounds of marijuana over the course of his career.

13

On May 14, 2019, Newman was in the area of the investigation around Sharon Lakes Road in Charlotte, North Carolina, in case a traffic stop was needed. (Newman's assistance had been requested by Task Force officers). Newman began following the surveillance vehicles in the area until Defendant entered the Morningstar facility and left with the black bag. Once Defendant left the Morningstar facility, Newman began following Defendant directly.

Newman observed Defendant commit a traffic violation. Specifically, Newman testified that he observed Defendant's truck about six inches from the back of another vehicle. Newman stated that based on his training and experience, Defendant was following way too close. Newman testified that he activated his blue lights and had to work his way behind Defendant's truck because another vehicle had positioned itself between the two. After Defendant's vehicle stopped, he approached the vehicle and made contact with Defendant.

Newman stated to the driver (Defendant) that he had followed a car in front of him too closely. Newman told Defendant that he was a driving while impaired (DWI) enforcement officer. Newman detected an odor of marijuana coming from the interior of the vehicle as he talked to Defendant. Newman stated, to make the situation safer, he talked to Defendant about the smell of marijuana and the presence of marijuana "shake" in the vehicle only once he (Defendant) was out of the truck. Newman stated that based on his training and experience he was able to properly identify marijuana shake and the odor of marijuana.

Newman testified that he had training on North Carolina hemp laws and the permitted uses of hemp. He conceded that North Carolina hemp laws allow for hemp to be used to make rope, clothing, CBD oils and similar products. Newman testified that there is no reason to burn hemp. He did note that there was a medical exemption to consume hemp and CBD products for epilepsy, but that involved a droplet on the tongue, not smoking it.

Newman stated that he ultimately collected marijuana shake from numerous places within the vehicle. He testified that marijuana ash was distinguishable from marijuana shake because it was burnt and had the odor of marijuana on it. Newman stated that he did not have any of the shake or ash tested (by the lab to confirm that it was marijuana) because Defendant was not ultimately charged with a marijuana offense.

Newman stated that at the time of the traffic stop he knew it was a meth investigation because he had been involved with the investigation for approximately a month. Additionally, he stated that he was aware of a radio communication that stated Defendant had brought a bag out of the storage facility with him. The officer stated he had a discussion with Bridges regarding conducting a traffic stop on Defendant after he (Defendant) retrieved the bag from his storage locker.

Newman testified about an alleged discrepancy in his testimony regarding Defendant's proximity to the other vehicle. It was suggested that Newman had stated on different occasions that Defendant's vehicle was about six inches from the vehicle in front of it, and five to six feet from the vehicle in front of it. Newman clarified that Defendant accelerated up to six inches off the back of the vehicle, then drifted back to about six feet.

Newman testified that at the scene he directed another officer to stay close to Defendant because he was worried about officer safety due to his not being handcuffed and the possibility he might flee. While watching the body-worn camera footage in court, Newman testified to the presence of marijuana shake and the air freshener inside the console of the vehicle. Officer Newman testified that the combination of finding the bag, containing what his training and experience suggested was methamphetamine, and Defendant's attempt to move around while he searched the vehicle, led him to place Defendant in handcuffs.

15

On cross-examination, Newman testified that his canine position and training involves having narcotics in his possession or in his patrol vehicle regularly. He stated that he is assigned marijuana, meth, cocaine, ecstasy, and heroin to help train his dog using different scents. He estimated that he has performed close to a thousand canine automobile searches over the past twelve years. Newman testified that this training has familiarized him with the drugs to the point that sometimes he can suspect one of the drugs is present and the canine will corroborate his suspicions.

Newman testified that he was following directly behind Defendant in traffic and observed him commit the traffic violation at the four-lane intersection of South Boulevard and Tyvola Road. The four-lane intersection consisted of two left-hand turning lanes and two straight lanes. He stated that their vehicles were in the far left turning lane, but while the vehicles were turning, Defendant drifted over into the right turning lane and veered in between two other vehicles. Newman stated that because Defendant veered in between two other vehicles, he (Newman) was prevented from getting his patrol vehicle behind Defendant's truck right away. This resulted in the traffic stop being performed approximately a quarter mile from the South Boulevard and Tyvola Road intersection.

Newman testified that earlier on May 14, 2019, he was a part of the surveillance team that followed Defendant from his residence at 8617 Woodlake Court, Apt. 302 to the Morningstar storage facility. While surveilling Defendant, Newman stated that he was advised over the radio that Defendant took a black bag from his residence and put it in his vehicle. Newman testified that once at the storage facility, Defendant was observed taking a gray and black bag (a separate bag) from the vehicle into the storage facility, and then bringing it back out to his vehicle.

Newman testified that during the vehicle search at the scene of the traffic stop, he located both bags in the back floorboard behind the front passenger seat. Newman stated the black bag contained a black case that contained two firearms. The gray bag contained the substance that felt like glass, which ended up being methamphetamine. Newman testified that when he asked Defendant about the firearms, Defendant acknowledged that he knew the guns were there and that they were clean guns.

Newman testified that he mentioned the odor of marijuana to Defendant as soon as he smelled it. He stated that he immediately began talking about DWI enforcement to take the Defendant's mind off the drugs because he wanted Defendant to remain calm as a de-escalation tool. Newman testified that Defendant admitted to him that he was following too closely to the vehicle in front of him. Newman stated that Defendant told him he was looking forward and backwards and didn't see the other vehicle. Newman confirmed that Defendant stated he made a simple mistake and that if the car in front of him had hit the brakes he would have rear-ended him.

3. Recall Testimony of Detective Bridges

Detective Bridges testified on recall that he was not the lead investigator on this case; he was the co-lead investigator with Detective Brad Myers. Bridges testified that they had received the surveillance footage and card swipe data from the Morningstar facility on the evening *after* the Defendant was arrested. Bridges testified that he did not have any of the Morningstar information and that he did not even learn of the Morningstar facility prior to May 14, 2019.

Bridges testified that he had been conducting surveillance of Defendant at the Morningstar facility prior to the traffic stop on May 14, 2019. Bridges testified that officers with the Task Force had observed Defendant enter the Morningstar facility with a gray in color bookbag and then

returned to the truck with it. Bridges testified that the surveillance officers felt that the bag was empty when he entered the facility and that it contained an item when he exited.

Bridges testified that the Task Force officers made a joint decision to conduct the walled-off traffic stop. Bridges stated that when Defendant entered and as he was leaving the Morningstar facility on May 14, 2019, the officers discussed making the traffic stop over the radio.

## III. STANDARDS OF REVIEW

An officer may stop and briefly detain a person for investigative purposes (known as an investigative or <u>Terry</u> stop) when there is "reasonable suspicion," based on articulable facts, that criminal activity is afoot. <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000); <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989); <u>Terry v. Ohio</u>, 392 U.S. 1, 30 (1968). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. <u>United States v. Arvizu</u>, 534 U.S. 266 (2002) (reaffirming "totality of the circumstances" test); <u>United States v. Branch</u>, 537 F.3d 328, 336 (4th Cir. 2008); <u>United States v. Crittendon</u>, 883 F.2d 326, 328 (4th Cir. 1989).

The Supreme Court has described "probable cause" to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). However, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." <u>Id</u>. at 232.

The probable cause standard does not:

> require officials to possess an airtight case before taking action. The pieces of an investigative puzzle will often fail to neatly fit, and officers must be given leeway to draw reasonable conclusions from confusing and contradictory information, free of the apprehension that every mistaken search or seizure will present a triable issue of probable cause.

Taylor v. Farmer, 13 F.3d 117, 121-22 (4th Cir.1993); accord Ornelas v. United States, 517 U.S. 690, 696 (1996) (probable cause exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found").

Prior to 1993, defendants could argue that a vehicle stop for a minor traffic violation was "pretextual" – that is, a "reasonable officer" would not have made the stop absent larger suspicions or investigative purposes. However, in United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993), the Fourth Circuit adopted the "objective test." Under this test, as long as the officer has an objective right to stop a vehicle, irrespective of the officer's subjective motivation or suspicion, the subsequent seizure of evidence of a more serious offense will not be suppressed on the ground that the stop was pretextual. Id; accord Ohio v. Robinette, 519 U.S. 33, 35 (1996); Whren v. United States, 517 U.S. 806 (1996); United States v. McDonald, 61 F.3d 248, 254 (4th Cir. 1995). The Court explained that "[u]nder the objective test, if an officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment. That is so regardless of the fact that the officer would not have made the stop but for some hunch or inarticulable suspicion of other criminal activity . . ." Hassan El, 5 F.3d at 729-31. Moreover, the objective test applies "however minor" the traffic violation in question. Id. at 730.

Miranda warnings are required when a subject is interrogated while in custody. Miranda v. Arizona, 384 U.S. 436 (1966); accord Dickerson v. United States, 530 U.S. 428, 444 (2000) (reaffirming Miranda as "a constitutional rule that Congress may not supersede legislatively," reversing unique Fourth Circuit holding to the contrary). The test for determining whether an individual is "in custody" for Miranda purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest." Berkemer

19

v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations omitted). Statements volunteered by a defendant while he is in custody are not implicated by Miranda. Rhode Island v. Innis, 446 U.S. 291, 300 (1980). However, statements made in response to "the functional equivalent" of custodial interrogation do require Miranda warnings. Id. To be the functional equivalent of custodial interrogation, the law enforcement officer should know [the statements or questions] are likely to elicit an incriminating response. Id. At 299-304.

## IV. DISCUSSION

As noted, Defendant challenges the constitutionality of the law enforcement officer's stop of his vehicle and of the subsequent search of the vehicle that revealed firearms and methamphetamine. Defendant also challenges the admissibility of statements he may have made at the scene, which he asserts were the fruit of custodial interrogation absent Miranda warnings.

As set forth below, the Court concludes that the stop and search of the vehicle are constitutionally sound under two alternative theories. First, the lengthy drug investigation of Defendant testified to by Detective Bridges, standing alone, arguably established probable cause to stop Defendant's vehicle and search it. Second, in the alternative, Defendant's commission of the traffic violation of following too closely established reasonable suspicion to stop Defendant's vehicle. Once Officer Newman conducted this legal "walled-off" stop, when he smelled marijuana and saw what he believed to be marijuana shake, he had probable cause to search the vehicle.

The Miranda question is not as straightforward. It is not clear what statements from Defendant the Government may seek to offer. In any event, Defendant was certainly in custody once placed in handcuffs at the scene, and any statements made by him after that should be excluded.

### A. Independent Basis for Stop and Search Based on Investigation into Defendant

Defendant's "Supplemental Memorandum. . . " (Document No. 63) and Defendant's "Reply to United States' Response. . ." (Document No. 67) both largely focus on the circumstances surrounding the "walled off stop" – for following-too-closely and the subsequent search of the vehicle based on the purported smell of marijuana.  Defendant argues that the evidence obtained from the stop should be suppressed for four reasons:  1) the statute (N.C.G.S. § 20-152) that led to the traffic stop is unconstitutionally vague;  2) there was neither probable cause nor reasonable suspicion for the stop, making the stop pretextual in nature;  3) even if the stop was valid when it began, the traffic stop was extended well past the purported traffic violation;  and 4) Defendant never received proper <u>Miranda</u> warnings.  (Document No. 63, p. 7-26).

In Defendant's "Supplemental Memorandum. . .," Defendant also argues:

> "TFO Newman was directly involved in the investigation of Mr. Brooks' potential drug activity.  He wanted to obtain an arrest at any cost.  TFO Newman's involvement in the investigation, combined with:  1) the failure to follow Mr. Brooks for any length of time;  2) the lack of facts in the declaration regarding the speed or distance of the vehicles;  3) the lack of facts concerning TFO Newman's ability to evaluation speeds or distances;   and 4) TFO Newman's conflicting stories about "five feet" versus "five inches" strongly indicate that TFO Newman lacked reasonable suspicion or probable cause and instead manufactured the stop to arrest Mr. Brooks without the inconvenience of obtaining a warrant."

(Document No. 63, p. 14).  Defendant notes that "[t]he Fourth Amendment permits an officer to investigate matters unrelated to the reason for the traffic stop as long as it does not lengthen the roadside detention."  <u>Id.</u> at 16 (citing <u>United States v. Bowman</u>, 884 F.3d 200, 210 (4th Cir. 2018)).

In response, the Government contends that "even if the officer had not established probable cause for a "walled off" stop and seizure of Defendant Brooks's vehicle, there was independent probable cause based on the investigation up to that point."  (Document No. 72, p. 1).  Prior to the arrest of the Defendant, the Government asserts that law enforcement had "reasonable suspicion

21

to stop the vehicle based on the informant information and Brooks' activities that day." (Document No. 44, p. 7).

The undersigned agrees with the Government here that the lengthy drug investigation of Defendant testified to by Detective Bridges, standing alone, arguably established probable cause for both the stop and the search. At the very least, it established reasonable suspicion for the stop, and subsequent events led to probable cause to search the vehicle. The record already summarized is replete with facts that support this conclusion. After all, probable cause to search has been described as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). This record greatly exceeds that standard.

In April 2019, law enforcement officers utilized a confidential informant (R.F.) to conduct three controlled buys from an individual (K.F.). (Tr. 1, p. 28). R.F. reported that K.F. was his source of methamphetamine who, in turn, disclosed that her source was the Defendant. (Tr. 1, p. 28). R.F. also disclosed that K.F. was in a romantic relationship, resided with, and shared use of a Ford Flex with Defendant. (Tr. 1, p. 27-28). That same month, Detective Bridges learned of an ongoing FBI investigation into Defendant. (Tr. 1, p. 34). The Brunswick County officers received information from Mr. Henry, a cooperating witness, about Defendant's methamphetamine trafficking from Gastonia in 2018. (Tr. 1, p. 34-37). In October 2018, law enforcement surveilled Defendant, Mr. Henry, and others in Myrtle Beach and Wilmington. (Tr. 1, p. 35). Mr. Henry disclosed to law enforcement that he was a methamphetamine courier and he would deliver meth from Charlotte to Wilmington for Defendant. (Tr. 1, p. 36). Mr. Henry told law enforcement that Defendant did not keep methamphetamine on his person, instead utilizing storage units in the Charlotte area. (Tr. 1, p. 37).

Surveillance of Defendant's apartment led officers to the U-Haul storage facility that was frequented by Defendant and his co-conspirators. (Tr. 1, p. 30-33). Law enforcement served an administrative subpoena on the U-Haul facility to obtain information on who entered the storage facility and to corroborate their visual observations. (Tr. 1, p. 33). Subsequent to the administrative subpoena, the specific storage unit used by Defendant and his co-conspirators in the U-Haul facility was positively identified. (Tr. 1, p. 38). On April 11, 2019, Officer Newman employed his drug detection dog on the unit used by Defendant, Unit 240, and the dog gave a positive indication of the presence of drugs. Id. U-Haul video footage, swipe data, and law enforcement surveillance show that the last day Defendant and his co-conspirators visited and used the storage unit was April 30, 2019. (Tr. 1, p. 44-45).

On May 14, 2019, the day of the traffic stop, law enforcement conducted surveillance of Defendant and his apartment. (Tr. 1, p. 49). Law enforcement observed him leave his home, with a gray backpack in his hand, and drive to Morningstar Storage at 8100 South Boulevard, Charlotte NC. (Document No. 74-1, p. 8). Defendant exited his vehicle with a gray backpack and entered his storage unit before shortly returning with the same backpack. Id. It appeared empty when he entered, but it appeared to have an item in it when he departed.

Officer Newman had been involved with some aspects of the investigation prior to stopping Defendant on May 14, 2019. At the hearing, Detective Bridges testified that Officer Newman had spoken with the FBI, participated in surveillance, and used his K-9 to investigate the U-Haul storage facility, which yielded a positive reaction from the K-9 for the presence of drugs. (Tr. 1, p. 64)

Warrantless searches "are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." California v. Acevedo, 500 U.S.

565, 580 (1991) (quoting <u>Mincey v. Arizona</u>, 437 U.S. 385, 390 (1978)). One such exception is the presence of "exigent circumstances" – an exception presumptively present in the automobile context because of the inherent mobility of the car and the danger that contraband inside the car may disappear if police take the time to obtain a warrant. <u>See</u> <u>California v. Carney</u>, 471 U.S. 386, 390–91 (1985). Thus, the police may search a car without a warrant as long as there is probable cause to believe the car contains contraband. <u>Carney</u>,471 U.S. at 392.

The police may also conduct warrantless searches of "closed containers" within an automobile, but only if they have probable cause to believe the closed container may contain contraband. <u>See</u> <u>Acevedo</u>, 500 U.S. at 579-580. "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" <u>U.S. v. Kelly</u>, 592 F.3d 586, 590 (4th Cir. 2010) (quoting <u>U.S. v. Ross</u>, 456 U.S. 798, 825 (1982)).

Based on the evidence presented at the hearing, it appears Officer Newman had ample probable cause – to believe that there were drugs in the Defendant's vehicle – and therefore to stop and search the vehicle. The undersigned finds that Officer Newman had probable cause to stop and search Defendant independent of the traffic violation and the smell of marijuana detected during the stop. The undersigned is persuaded that Government's actions did not violate Defendant's Fourth Amendment Rights.

### B. Stop and Search Based on Following Too Close and Smell of Marijuana

Again, Defendant seeks to suppress evidence obtained as a result of the stop and search conducted of the motor vehicle operated by Defendant on May 14, 2019. (Document No. 58, p. 1). Defendant asserts the traffic stop was pretextual, without a basis supported by law, and that the stop was impermissibly extended. <u>Id.</u> Defendant argues that the lack of evidence regarding the relative speeds of the vehicles, the distance between the cars, or any other information from

which a reviewing court can verify the allegation of "following too closely," negates any assertion of probable cause or reasonable suspicion for the traffic stop. (Document No. 63, p. 15).

Additionally, Defendant alleges the contradiction in Officer Newman's testimony – that he stated Defendant was both "five to six inches" *and* "five to six feet" away from the other vehicle – implies there was no traffic violation. Defendant states that even if Officer Newman observed Defendant move close to another car while turning, this action does not constitute following too closely. Id. at 17. Defendant argues that Newman's failure to observe him following a vehicle for a length of time negates any probable cause or reasonable suspicion an officer might have had in a case such as this involving an allegation of following too closely. Id.

The Government's response is that the investigative team had probable cause to stop Defendant while he was driving – both for a traffic violation, as well as based on the drug trafficking investigation. (Document No. 65, p. 1). Additionally, the Government contends it had probable cause to search the vehicle based on Officer Newman's "plain smell" and "plain view" of marijuana and marijuana shake in the vehicle, as well as based on the drug trafficking investigation at that point in time. Id.

The Government argues that Officer Newman's attempt to explain the following too close violation to Defendant, in an easier way for him to understand, does not render the statute unconstitutionally vague. (Document No. 65, p. 2). The Government also contends that Defendant does not cite a single case in support of his position that the statute is unconstitutionally vague. Id. Finally, the Government asserts that even if, for argument's sake, the traffic violation was an unconstitutional basis for stopping Defendant, it does *not* require suppression. Id.

The undersigned agrees with the Government. On May 14, 2019, Newman knew of the methamphetamine trafficking case and that other officers involved had more knowledge of

Defendant than he did. Newman positioned his patrol vehicle directly behind Defendant's vehicle and followed him. Upon observing Defendant's vehicle drift from the far left turning lane into the right turning lane – veering in-between two other vehicles who were also turning – Officer Newman decided to conduct a traffic stop. An experienced officer – and a credible witness – Officer Newman testified he observed Defendant following the vehicle in front of him very closely. Defendant subsequently admitted as much at the scene.

Under the "objective test" adopted by the Fourth Circuit in United States v. Hassan El, as long as the officer has an objective right to stop a vehicle, irrespective of the officer's subjective motivation or suspicion, the subsequent seizure of evidence of a more serious offense will not be suppressed on the ground that the stop was pretextual. 5 F.3d 726, 730 (4th Cir. 1993). Here, Newman had an objective right to stop Defendant's vehicle based on the methamphetamine trafficking investigation; but he also had the right to stop Defendant based on the traffic violation. In the absence of "reasonable suspicion" of further criminal activity – which Officer Newman did have – the scope of a routine traffic stop is limited. Specifically, "the officer may request a driver's license and vehicle registration, run a computer check, and issue a citation, but . . . any further detention for questions is beyond the scope of a *Terry* stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." United States v. Brugal, 209 F.3d 353, 358 (4th Cir. 2000), quoting Rusher, 966 F.2d 868, 876-877 (4th Cir. 1992)). Accord Rodriguez v. United States, 135 S.Ct. 1609, 1615-1616 (2015); Illinois v. Caballes, 543 U.S. 405, 407 (2005); United States v. Sharpe, 470 U.S. 675, 686 (1985).

Here, upon approaching Defendant's vehicle, Officer Newman smelled the odor of marijuana and observed marijuana shake in plain view. Upon smelling and seeing marijuana inside the vehicle, Newman had probable cause to believe there was drug contraband to be found in the

vehicle.  See Illinois v. Gates, 462 U.S. 213 (1983).  Once Newman had probable cause to believe drug contraband was in the vehicle, he was no longer restricted to the limited scope of a routine traffic stop.

Finally assuming, *arguendo*, N.C.G.S. § 20-152 is vague, which the undersigned does not believe, the fact that Defendant was stopped by Newman for following too closely and incriminating evidence was found does not require suppression.  See United States v. Gibbs, 680 Fed.Appx. 184, 185 (4th Cir. 2017) (holding even assuming Maryland's following-too-closely statute was vague, "the officer was entitled to rely on the statute unless it was 'clearly unconstitutional.'").

In sum, this alternative basis for the officer's stop and search is not complicated.  While following Defendant, Officer Newman, an experienced officer, observed Defendant following another vehicle too closely in traffic.  Based on that reasonable suspicion, Newman executed a traffic stop.  Upon approaching Defendant's vehicle, Newman very quickly noted the odor of marijuana and observed marijuana shake in the vehicle.  This observation established probable cause for the search he then conducted.  There was no improper extension of the stop.  Whether the statute is unconstitutionally vague is not relevant to the analysis of this stop and search.

### C. **Miranda** Violations

Defendant seeks to suppress any statements made by him at the scene of the traffic stop as violative of Miranda.  (Document No. 58, p. 1).  Defendant asserts he was never Mirandized, but nevertheless "was subjected to custodial interrogation."  (Document No. 63, p. 23).  Defendant argues that Officer Newman took Defendant's license, ordered Defendant out of the car for a sobriety test that never occurred, and repeatedly told Defendant to "have a seat."  Id.  Defendant further contends that the presence of three armed officers, the investigatory nature of the stop, and

the length of the stop – nearly 30 minutes – indicates that Defendant was placed in custody.  Id. at 23-25.

Next, Defendant asserts that Defendant was "subjected to a number of statements intended to elicit incriminating statements."  Id. at 24.  For example, Defendant contends that "TFO Newman asked Mr. Brooks about his driving, about his drug use, about his drug possession, his travel plans, his legal issues, his uncle's criminal history, and other topics."  Id.  Defendant contends that "[t]hese direct questions clearly qualify as interrogatory under current precedent." Id. (citing United States v. Bernard, 927 F.3d 799, 806 (4th Cir. 2019)).  Defendant further contends he was not advised of his Miranda rights, even after Defendant was handcuffed and was told he was under arrest.  (Document No. 65, p. 25).

For its part, the Government has not addressed the issue of custodial interrogation in its briefs. (Document Nos. 65, 72).  Neither has the Government identified at any hearing what statement by Defendant it may seek to admit into evidence.  Additionally, Defendant does not specifically identify a specific self-incriminating statement allegedly obtained in violation of his Miranda rights at all.  (Document No. 58).  In general, Defendant asserts that all questions asked and answered during the traffic stop were products of a custodial interrogation without Miranda warnings.  (Tr. 2, p. 101).

Defendant carries the burden of supporting his claim by identifying the statements made during the traffic stop that were in violation of his Miranda rights.  See e.g., United States v. Edwards, 563 F.Supp.2d 977, 994 (D.Minn. 2008), aff'd United States v. Bowie, 618 F.3d 802 (8th Cir. 2010) ("At the end of the day, as the moving party, at a minimum it is the defendant's burden to come forth with some evidence and argument to support his position that evidence,

statements or a witness identification should be suppressed."). Nonetheless, this Court will address this issue as best it can.

The term "interrogation" refers not only to express questioning, but also to any words or actions on the part of law enforcement (other than those normally attendant to arrest and custody) that they should know are reasonably likely to elicit an incriminating response from the suspect. See Rhode Island v. Innis, 446 U.S. 291, 297-298 (1980) (quoting Miranda v. Arizona, 384 U.S. 436 (1966). In Innis, the Court also noted, "volunteered statements of any kind are not barred by the Fifth Amendment." Innis, 446 U.S. at 300 (quoting Miranda, 384 U.S. at 478).

The test for determining whether an individual is "in custody" under Miranda is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a 'degree associated with a formal arrest.'" Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (internal quotations omitted). See, e.g., United States v. Giddins, 858 F.3d 870, 879 (4th Cir. 2017); United States v. Hargrove, 625 F.3d 170, 178 (4th Cir. 2010). The relevant inquiry in determining whether a suspect was "in custody" is how, viewed objectively, "a reasonable man in the suspect's position would have understood his situation." Berkemer, 468 U.S. at 442. Accord Stansbury v. California, 511 U.S. 318, 322, 325 (1994); United States v. Hashime, 734 F.3d 278, 282-283 (4th Cir. 2013); and Hargrove, 625 F.3d at 178.

The undersigned agrees with Defendant that a custodial interrogation did occur during this traffic stop. Unlike in Innis, Defendant's incriminating statement about the firearms was the product of words or *actions* on the part of law enforcement that they should have known, based on their training and experience, were reasonably likely to elicit an incriminating response. Here, Officer Newman placed Defendant in handcuffs and required him to sit on the tailgate of the

vehicle while he opened the bags and showed Defendant the contents while making comments. (BWC footage Ex. B).

The undersigned finds that the handcuffing of Defendant, and the way Officer Newman opened the case, discovered the firearms, and then turned and allowed Defendant to see inside, as if to elicit a response, suggests custodial interrogation. Until the point he was handcuffed, Defendant was free to move around and at one point even got off the tailgate and came around the vehicle while Officer Newman was searching the passenger area. This suggests Defendant was not in custody, nor that his freedom of movement was curtailed to a degree associated with a formal arrest as articulated in <u>Berkemer</u>, at that time. However, right before Officer Newman was about to search the bag, which he suspected contained an illegal substance, he decided to limit the Defendant's freedom of movement by placing him in handcuffs and requiring him to sit on the tailgate of the vehicle. An objectively reasonable person in the Defendant's position would likely understand his position at that point as being "in custody."

The undersigned thus finds that Defendant was in custody when Officer Newman placed him in handcuffs and restricted his movement to the tailgate of the vehicle. Additionally, Defendant was effectively interrogated through the words and actions of Officer Newman after Defendant was placed into custody. Therefore, the undersigned recommends that all statements made by Defendant after that point be suppressed as a violation of Defendant's <u>Miranda</u> rights; they appear to be the fruit of custodial interrogation without <u>Miranda</u> warnings.

## V.    CONCLUSION

For the reasons set forth, the undersigned finds that the stop of Defendant's vehicle, and its search, were constitutionally sound. The stop appears lawful based on either the ongoing drug investigation into Defendant or Defendant's commission of a traffic offense. The search likewise

appears lawful based either on that same investigation or the officer's detection of the odor of marijuana and the presence of marijuana shake in the vehicle. However, it appears the officer may have engaged in custodial interrogation of Defendant without <u>Miranda</u> warnings; the undersigned recommends that any statements made by Defendant after he was handcuffed at the scene be excluded.

## VI.     RECOMMENDATION

**IT IS, THEREFORE, RECOMMENDED** that "Defendant Lawrence Brooks' Motion To Suppress Evidence" (Document No. 58) is **GRANTED** in part and **DENIED** in part as described above.

## VII.     TIME FOR OBJECTIONS

The parties are hereby advised that pursuant to 28 U.S.C. § 636(b)(1)(C), and Rule 72 of the Federal Rules of Civil Procedure, written objections to the proposed findings of fact, conclusions of law, and recommendation contained herein may be filed within **fourteen (14) days** of service of same. Responses to objections may be filed within fourteen (14) days after service of the objections. Fed.R.Civ.P. 72(b)(2). Failure to file objections to this Memorandum and Recommendation with the District Court constitutes a waiver of the right to *de novo* review by the District Court. <u>Diamond v. Colonial Life</u>, 416 F.3d 310, 315-16 (4th Cir. 2005). Moreover, failure to file timely objections will preclude the parties from raising such objections on appeal. <u>Diamond</u>, 416 F.3d at 316; <u>Page v. Lee</u>, 337 F.3d 411, 416 n.3 (4th Cir. 2003); <u>Snyder v. Ridenhour</u>, 889 F.2d 1363, 1365 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 147-48 (1985), <u>reh'g</u> <u>denied</u>, 474 U.S. 1111 (1986).

Signed: October 23, 2020

David C. Keesler
United States Magistrate Judge